**Opinion filed April 29, 2010**



# In The

# Eleventh Court of Appeals

_____

## No. 11-10-00034-CV

_____

## IN RE RAY B. SMITH

**Original Habeas Corpus and Mandamus Proceeding**

## O P I N I O N

Relator, Ray B. Smith, Ph.D., brings this original habeas corpus proceeding and, alternatively, mandamus proceeding complaining of the trial court's finding him in contempt for violating a permanent injunction. Because the trial court's final order and judgment of contempt lacks evidentiary support, we conditionally grant mandamus relief.

*Introduction*

In 2007, Dr. Smith published a book entitled *Cranial Electrotherapy Stimulation, Its First Fifty Years, Plus Three: A Monograph* (the 2007 book). Cranial Electrotherapy Stimulation (CES) is used for treatment of anxiety, depression, insomnia, and other conditions. Dr. Smith's 2007 book contained his meta-analyses of studies that had been performed to determine the effectiveness of CES in treating various conditions. "Meta-analysis" is defined as "a quantitative statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance." MERRIAM-WEBSTER'S COLLEGIATE

DICTIONARY 779 (11th ed. 2004).  Dr. Smith explained in his 2007 book that "[m]eta-analysis is a way of combining the results of many separate studies to see the effectiveness of a treatment."

Dr. Smith is a former Director of Science at Electromedical Products International, Inc. (EPII).  EPII researches, develops, and markets CES technology.  EPII asserted that Dr. Smith's publication of his 2007 book violated a permanent injunction that it had obtained against Dr. Smith in 2003.  Therefore, EPII filed a motion to enforce the permanent injunction and to hold Dr. Smith in contempt for violating the permanent injunction.  Following a hearing on EPII's motion, the trial court found that Dr. Smith had violated the terms of the permanent injunction and entered its final order and judgment of contempt against him.  In this original proceeding, Dr. Smith challenges the trial court's final order and judgment of contempt.

*The 2003 Suit and Judgment*

Dr. Smith began his employment with EPII in 1998.  At that time, Dr. Smith and EPII entered into a Non-Disclosure/Non-Circumvention Agreement.  The agreement contained a "Restrictive Covenant" in which Dr. Smith agreed that, during or after the term of his employment, he would not, among other things, "disclose, disseminate, publish, or use . . . [EPII's] Confidential Information, . . . except as may be required in the proper discharge of [his] duties pursuant to [his] employment."  As defined in the agreement, the term "Confidential Information" included information "disclosed to [Dr. Smith] or known by [Dr. Smith] as a consequence of or through [his] employment by EPII which information is not generally known in the industry in which EPII is or may become engaged."  The agreement provided that, upon the termination of Dr. Smith's employment, (1) Dr. Smith would return all confidential information and customer lists to EPII, (2) EPII would be entitled to injunctive relief against Dr. Smith if he breached the restrictive covenant, and (3) Dr. Smith would not enter into or engage in any business in competition with EPII for a period of three years from the date of his termination.

Dr. Smith's employment duties included writing items for publication on behalf of EPII. At EPII's request, Smith began writing a manuscript that was entitled *Cranial Electrotherapy Comes of Age*.  Before the manuscript was completed, EPII discovered facts leading it to conclude that Dr. Smith had breached the Non-Disclosure/Non-Circumvention Agreement. Therefore, EPII terminated Dr. Smith's employment.

On February 7, 2003, EPII filed suit against Dr. Smith for breach of the agreement. In its petition, EPII requested the trial court to enjoin Dr. Smith from "disclosing, publishing, and/or using [its] confidential information and trade secrets" and from "competing with EPII or participating in business in a similar capacity to EPII's business for a period of three years from the date of the termination of [Dr.] Smith's employment."

Following a bench trial, the trial court concluded that Dr. Smith had breached the agreement. On August 11, 2003, the trial court entered a judgment in EPII's favor. In the judgment, the trial court found that, unless permanently enjoined, "[Dr. Smith] intends to directly or indirectly participate in business in a similar capacity to EPII's business in violation of the non-competition provisions of his Non-Disclosure/Non-Circumvention Agreement" and "[Dr. Smith] intends to disclose, disseminate, publish, or use or permit the use, of [EPII's] business information in violation of the Non-Disclosure/Non-Circumvention Agreement." Therefore, the trial court granted injunctive relief in EPII's favor and ordered the following:

> [T]hat [Dr. Smith] . . . desist and refrain from directly or indirectly entering into or engaging in any business in competition with [EPII] . . . through January 31, 2006.[1]
>
> . . . .
>
> . . . THAT [Dr. Smith] . . . desist and refrain from . . . disclosing, disseminating, lecturing upon, publishing, using or permitting the disclosure, dissemination, publishing or use of any and all information disclosed to [him] or known by [him] as a consequence or through his employment by [EPII] which information is not generally known in the industry in which [EPII] is engaged or may become engaged. . . .[2]

---

[1] The trial court stated:

For purposes of this order "business in competition with [EPII]" shall include, but not be limited to, the research, development, inventing, manufacturing, constructing, promoting, accounting, merchandising, advertising, selling, leasing, contracting and general business techniques as they relate to Cranial Electrotherapy Stimulation ("CES") devices, Transcutaneous Electrical Nerve Stimulation ("TENS") devices, wound healing devices, and the research, data recovery, analysis, drafting and publication of written materials related to CES, TENS and wound healing.

[2] The trial court stated that "information" included, but was not limited to:

[I]nformation relating to research, development, programming, techniques of application, inventions, manufacturing, operations, construction, promotion, purchasing, accounting, marketing, merchandising, advertising, selling, renting, leasing, negotiating, contracting, recording; information identifying or tending to identify any or all of [EPII's] customers, clients, employees or insured of customers; recordings, scripts, concepts, ideas, advertising, promotional material, copy, logos, techniques, methods, plans, whether or not copyrightable or patentable; discoveries, concepts, ideas, processes, methods, formulas, designs, techniques and improvements thereof.

. . . [T]hat [Dr. Smith] . . . return any and all copies . . . of all unpublished manuscripts, monologues, articles, books and studies, whether in draft or final form, that were written on the subject of CES, TENS, and/or wound healing while an employee of [EPII] or thereafter, including, but not limited to, all copies of "*Cranial Electrotherapy Comes of Age.*" The Court finds that all manuscripts, monologues, articles, books and studies written by [Dr. Smith] on the subject of CES, TENS and/or wound healing during or after his employment with [EPII] are the property of [EPII] and [Dr. Smith] may not disclose, disseminate, lecture upon, publish, use or permit the disclosure, dissemination, publication or use of any of the materials listed above.

In addition to granting injunctive relief, the trial court awarded attorney's fees to EPII. The trial court entered findings of fact and conclusions of law in support of its judgment. In one finding of fact, the trial court stated that, under the Non-Disclosure/Non-Circumvention Agreement, "in exchange for EPII providing Smith with confidential business information, Smith agreed not to disclose such confidential business information during or after his employment with EPII."

Dr. Smith appealed the trial court's 2003 judgment to this court. In a single point of error, Dr. Smith contended that the trial court lacked subject-matter jurisdiction over EPII's claims because the claims were copyright claims that fell within the exclusive jurisdiction of the federal courts. We disagreed with Dr. Smith, and we affirmed the trial court's judgment. *See Smith v. Electromedical Prods. Int'l, Inc.*, No. 11-03-00386-CV, 2005 WL 1983550 (Tex. App.—Eastland Aug. 18, 2005, no pet.) (mem. op.).

*The Current Proceedings*

Following Dr. Smith's publication of his 2007 book, EPII filed its motion to enforce the permanent injunction and for contempt. In its motion, EPII alleged that Smith had violated the permanent injunction (1) by publishing his 2007 book and (2) by failing to return to EPII all copies of EPII's 2003 unpublished manuscript, *Cranial Electrotherapy Comes of Age* (the 2003 manuscript). The trial court held an evidentiary hearing on EPII's motion. Daniel Kirsch, Ph.D. (the chairman of EPII) and Dr. Smith testified. Following the hearing, the trial court entered its final order and judgment of contempt.

As set forth above, the trial court included three areas of injunctive relief in the 2003 permanent injunction. First, the trial court enjoined Dr. Smith from competing with EPII through January 31, 2006. Second, the trial court enjoined Dr. Smith from disclosing or using information he learned through his employment with EPII that was "not generally known in the industry." Third, the trial court required Dr. Smith to return all copies of the listed materials,

4

including the 2003 manuscript, and the trial court found that all such materials were EPII's property and prohibited Dr. Smith from disclosing or using the materials.

In finding Dr. Smith in contempt, the trial court relied on the third area of injunctive relief in the 2003 permanent injunction. Specifically, the trial court stated in the contempt order that the permanent injunction contained the following provision:

> ORDERED, that [Dr. Smith] be and hereby is commanded to return any and all copies, whether currently held in paper or electronic or disk format, of all unpublished manuscripts, monologues, articles, books, and studies, whether in draft or final form, that were written on the subject of CES, TENS and/or wound healing while an employee of [EPII] or thereafter, including, but not limited to, all copies of "*Cranial Electrotherapy Comes of Age.*" The Court finds that all manuscripts, monologues, articles, books, and studies written by [Dr. Smith] on the subject of CES, TENS and/or wound healing during or after his employment with [EPII] are the property of [EPII] and [Dr. Smith] may not disclose, disseminate, lecture upon, publish, use or permit the disclosure, dissemination, publication, or use of any of the materials listed above.

The trial court found that "Dr. Smith's 2007 book entitled *Cranial Electrotherapy Stimulation, Its First Fifty Years, Plus Three: A Monograph* ('Smith's 2007 Book') is more than substantially the same as the contents of Plaintiff EPII's 2003 Manuscript, which is EPII's property." Based on this finding, the trial court concluded that Dr. Smith had knowingly violated the permanent injunction "(i) [by] materially using EPII's 2003 Manuscript in the publication of Dr. Smith's 2007 Book, and (ii) by failing to return to EPII all copies and/or notes of his work on EPII's 2003 Manuscript." Therefore, the trial court granted EPII's motion to enforce the permanent injunction and for contempt. The trial court stated that "Defendant Dr. Smith is found in contempt of this Court's August 11, 2003 permanent injunction prohibiting his publication of the information within EPII's 2003 Manuscript, and further requiring his return to [EPII] of all copies and drafts of EPII's 2003 Manuscript."

Based on its finding that Dr. Smith was in contempt, the trial court set forth the following remedies in its final order and judgment of contempt:

> (1) Dr. Smith is hereby found in contempt and ordered to be incarcerated in the Palo Pinto county jail for 180 days.

> (2) Within 30 days of the signing of this Order, Dr. Smith, at his sole expense, shall recall all copies of Dr. Smith's 2007 Book that have been printed, sold, or otherwise distributed, either directly by himself, or through any employer, and/or through any third parties pursuant to his direction or control, expressly including,

but not limited to, amazon.com and barnesandnoble.com; and shall thereafter produce all recovered books to Plaintiff's counsel within 30 days of Dr. Smith's receipt. Dr. Smith shall fully and concurrently reimburse all purchasers and/or distributors of same, including purchase price, shipping costs, and all other reasonable expenses.

(3) Within 30 days of the signing of this Order, Dr. Smith shall issue written instruction to Fisher Wallace Laboratories, in a form to be approved by Plaintiff's counsel, directing Fisher Wallace Laboratories to remove Dr. Smith's 2007 Book from Fisher Wallace's website, and to return to Dr. Smith all copies of Dr. Smith's 2007 Book, which Dr. Smith shall forward to Plaintiff's counsel within 30 days of Dr. Smith's receipt of same.

(4) Within 30 days of the signing of this Order, Dr. Smith shall issue written apologies, in forms acceptable to the Court, to both this Court, for violating the Court's lawful orders, and to Plaintiff, for Dr. Smith's prohibited use of Plaintiff's proprietary information.

(5) Within 30 days of the signing of this Order, Dr. Smith shall return, and seek any and all non-parties to return, any and all manuscripts, monologues, articles, books and studies that were written by Dr. Smith on the subject of CES, TENS, and/or wound healing while an employee of Plaintiff, or based upon information acquired during such employment, and/or his work with same, pursuant to this Court's Final Judgment, dated August 11, 2003.

(6) Within 30 days of the signing of this Order, Dr. Smith shall provide an accounting of all compensation and other consideration received by and/or promised to Dr. Smith arising from the sale of his 2007 Book, and/or the writing of same as an employee, agent, or contractor for himself or others. Within 60 days of delivery to Plaintiff of Dr. Smith's accounting, Plaintiff may make application to this Court for disgorgement and/or other relief regarding same.

The trial court suspended Dr. Smith's jail sentence specified in item 1, "contingent upon [Dr. Smith's] full and timely performance of the instruction items 2 through 6 above, failing which he shall present himself to this Court for incarceration under item 1 above and coercive confinement thereafter until the contempt is purged."[3] The trial court awarded EPII $52,000 for attorney's fees plus conditional attorney's fees in the event of an appeal.

---

[3]In the contempt order, the trial court punishes Dr. Smith for past violations – as found by the trial court – of the provision in the 2003 injunction prohibiting Dr. Smith from using or publishing EPII's materials. Therefore, the trial court's contempt order, at least in part, is in the nature of a criminal contempt order. *Ex parte Jones*, 36 S.W.3d 139, 142 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *Ex parte Busby*, 921 S.W.2d 389, 391 (Tex. App.—Austin 1996, pet. ref'd). However, the issue of whether the trial court's order is a criminal contempt order, a civil contempt order, or a hybrid contempt order has no bearing on the outcome of this original proceeding.

*Jurisdiction to Review the Trial Court's Contempt Order*

A court of appeals lacks jurisdiction to review a contempt order by direct appeal. *Tex. Animal Health Comm'n v. Nunley*, 647 S.W.2d 951, 952 (Tex. 1983); *Tracy v. Tracy*, 219 S.W.3d 527, 530 (Tex. App.—Dallas 2007, no pet.). Contempt orders that involve imprisonment may be reviewed via a petition for writ of habeas corpus; contempt orders that do not involve confinement may be reviewed via a petition for writ of mandamus. *In re Long*, 984 S.W.2d 623, 625 (Tex. 1999); *Tracy*, 219 S.W.3d at 530; *Adams v. Bell*, 94 S.W.3d 759, 762 (Tex. App.—Eastland 2002, no pet.). In this case, the trial court suspended its order of confinement. Because Dr. Smith has not been confined, his only possible relief is a writ of mandamus. *See In re Long*, 984 S.W.2d at 625; *see also In re Zenergy, Inc.*, 968 S.W.2d 1, 12 (Tex. App.—Corpus Christi 1997, orig. proceeding) (A suspended contempt order may be reviewed by habeas corpus "when and if [the trial court] enforces the judgment.").

*Standard of Review*

Mandamus is an extraordinary remedy that is available to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no adequate remedy by appeal. *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992). A trial court abuses its discretion by entering a contempt judgment that is not supported by evidence, and such a judgment is void. *In re Long*, 984 S.W.2d at 626-27 (The trial court abused its discretion in entering a contempt order; the contempt order was void because there was no evidence of contempt.); *Deramus v. Thornton*, 333 S.W.2d 824, 830 (Tex. 1960) ("A judgment of contempt without support in the evidence is void, and the Court is without jurisdiction to order punishment in the absence of some evidence of contemptuous disobedience.").

*Issues Presented*

Dr. Smith presents four issues for review. In his first issue, he asserts that the trial court's final order and judgment of contempt is void because it lacks evidentiary support. In his second issue, he asserts that the trial court abused its discretion by expanding the scope of the injunctive relief awarded in the 2003 judgment so as to preclude his use of nonconfidential information. In his third issue, he contends that, if we conclude that the trial court's interpretation of the 2003 judgment was reasonable, the 2003 judgment is ambiguous and susceptible to more than one interpretation. In his fourth issue, he contends that the trial court abused its discretion in ordering remedies other than confinement or a fine.

*The Evidence*

EPII introduced a copy of Dr. Smith's 2007 book and a copy of its 2003 manuscript into evidence. Both works contain Dr. Smith's meta-analyses of studies performed to determine the effectiveness of CES in treating various conditions. In his 2007 book, Dr. Smith meta-analyzed many of the CES studies that he meta-analyzed in EPII's 2003 manuscript.

Dr. Smith's 2007 book contains meta-analyses summarizing CES studies of the following syndromes: (1) insomnia; (2) depression; (3) anxiety; (4) cognitive dysfunction; and (5) drug abstinence. Dr. Smith meta-analyzed a total of fifty-seven CES studies in his 2007 book. Many of the fifty-seven studies fell into more than one of the five areas listed above. For example, Dr. Smith analyzed one study as being a sleep study, a depression study, and an anxiety study.

Dr. Smith's 2007 book contains tables identifying the CES studies that he meta-analyzed in each of the above areas. The tables show, among other things, the study design for each study (double blind, single blind, crossover, or open clinical) and the number of subjects involved in each study. The tables also reference each study by number so that the authors of the various studies may be identified from a reference list in the book. The tables also show that Dr. Smith meta-analyzed the following CES studies: (1) 18 sleep studies involving 648 patients that had been completed over the past 43 years; (2) 18 depression studies involving 853 patients that had been completed over the past 36 years; (3) 38 anxiety studies involving 1,495 patients that had been completed over the past 36 years; (4) 13 cognitive function studies involving 648 patients that had been completed over the past 31 years; and (5) 15 drug abstinence syndrome studies involving 535 patients.[4] Based on his five meta-analyses, Dr. Smith concluded (1) that the overall effectiveness of CES for treating sleep disorder conditions was 62% improvement; (2) that the overall effectiveness of CES for treating depression was 47% improvement; (3) that the overall effectiveness of CES for treating anxiety was 58% improvement; (4) that the overall effectiveness of CES for treating cognitive dysfunction was 44% improvement; and (5) that the overall effectiveness of CES for treating drug abstinence syndrome was 60% improvement.

EPII's 2003 manuscript contains meta-analyses by Dr. Smith of anxiety studies, depression studies, addiction studies, sleep studies, and cognitive function studies. EPII's manuscript also includes tables identifying the studies that Dr. Smith meta-analyzed. The tables

---

[4]The table entitled "Studies of the Drug Abstinence Syndrome with CES" does not indicate the time period during which the studies were completed. However, the reference numbers in the table indicate that the earliest study was published in 1967.

show, among other things, the authors of the studies and the number of patients treated in the studies. In the tables, the studies that Dr. Smith meta-analyzed are listed by author. In contrast, in the tables in Dr. Smith's 2007 book, the studies are grouped by study design: "Double Blind," "Single Blind," "Crossover," or "Open Clinical."

Dr. Kirsch testified that meta-analysis is a mathematical means of combining a number of studies to basically reaffirm the results. He said that Dr. Smith drafted EPII's 2003 manuscript. Dr. Kirsch also said that he had compared EPII's 2003 manuscript with Dr. Smith's 2007 book. He said that EPII's 2003 manuscript and Dr. Smith's 2007 book contain meta-analyses of the same CES data and that the meta-analyses in the two works are "virtually the same." He also said that the charts (tables) in the two works are "virtually identical." Dr. Kirsch testified that some studies that are included in EPII's 2003 manuscript are omitted from Dr. Smith's 2007 book. Dr. Kirsch also testified that, to his knowledge, Dr. Smith had not returned any copies of the 2003 manuscript. During cross-examination, Dr. Kirsch acknowledged that there are differences in Dr. Smith's 2007 book and EPII's 2003 manuscript.

Dr. Smith's counsel asked Dr. Kirsch a number of questions about whether EPII contended that Dr. Smith had published EPII's confidential or proprietary information in his 2007 book. EPII's attorney stated that "[w]e're not alleging that anything that has been published is confidential; and if that's what -- if that's the gist of what we're getting at, we'll concede that."

Dr. Smith testified that he did not have any copies of EPII's 2003 manuscript. Dr. Smith testified that most of the CES studies that are included in the 2003 manuscript are also included in his 2007 book. However, he said that the meta-analyses in the 2003 manuscript are not similar to the meta-analyses in his 2007 book. Dr. Smith testified that he completely redid the meta-analyses for the 2007 book. He said that he had not seen the 2003 manuscript in the past five years. The following exchange then took place:

> [EPII'S COUNSEL]: You had the -- just so happened to use the identical 109 studies in 2007 as the same 109 studies that you used in 2003. You just came upon those studies, right?
>
> [DR. SMITH]: No.
>
> In meta-analysis, you go through all the studies that are published and you take out the ones that can be meta-analyzed and you get as many of those you can find and you meta-analyze those. And I did that in the 2003 manuscript. I did it again for my book.

9

[EPII'S COUNSEL]: So is it your testimony that the 2007 book is a complete do-over? You had nothing at all about the 2003 manuscript. You didn't rely upon it. You didn't copy it. You didn't even have it. You didn't have any analysis or any access to it all and you just --

[DR. SMITH]: That's correct. That is correct.

[EPII'S COUNSEL]: -- for the purposes of drafting your 2007 book?

[DR. SMITH]: That's correct.

Dr. Smith testified that he learned how to perform meta-analysis in 1964 as part of his Ph.D. program. He said that he started studying CES in 1972. He testified that, in 1985, he performed a meta-analysis of forty-four CES studies in connection with writing a chapter in the book, *Neural Stimulation.* He also testified that, before working for EPII, he meta-analyzed fifty-two of the fifty-seven CES studies in his 2007 book. He said that the other five studies in his book were published while he was employed with EPII. Dr. Smith also said that all of the studies contained in the 2007 book were available to the public.

Dr. Smith testified that, with respect to his 2007 book, he did separate meta-analyses on the double-blind studies, the single-blind studies, and the open clinical studies. He testified that, in his 2007 book, he wrote about a new and previously unpublished theory as to why CES works. Dr. Smith believed that about 400 copies of his 2007 book had been sold.

*Dr. Smith's Challenges to Trial Court's Contempt Findings*

In his first issue, Dr. Smith argues that no evidence supports the trial court's conclusion that he violated the 2003 permanent injunction. The trial court found that the contents of the 2007 book and the contents of the 2003 manuscript are "more than substantially the same." Dr. Smith asserts that, based on this finding, the trial court impermissibly presumed, without evidentiary support, that he used the 2003 manuscript when writing his 2007 book and that he failed to return to EPII all copies of the 2003 manuscript. Dr. Smith asserts that the trial court's final judgment and order of contempt is void because it lacks evidentiary support.

In arguing that the evidence supports the trial court's final order and judgment of contempt, EPII asserts that "[Dr.] Smith's 2007 Book is nearly identical to EPII's 2003 Manuscript." A side-by-side comparison of Dr. Smith's 2007 book with EPII's 2003 manuscript shows that, while the works contain similarities, they are different in many respects. Some of the

similarities are (1) that Dr. Smith's 2007 book and EPII's 2003 manuscript both contain meta-analyses of CES studies, (2) that the 2007 book includes most of the CES studies that are included in EPII's 2003 manuscript, and (3) that, based on his meta-analyses, Dr. Smith reached similar conclusions as to the effectiveness of CES treatment in the 2007 book and the 2003 manuscript. However, viewing all the evidence in the record, the similarities in the works do not support the conclusion that Dr. Smith used EPII's 2003 manuscript in publishing his 2007 book.

Dr. Smith testified that he did not have a copy of EPII's 2003 manuscript when writing his 2007 book. He testified that he performed new meta-analyses for his 2007 book. Dr. Smith explained the process for performing meta-analysis. He said that all published studies are examined for the purpose of identifying which of the studies contain sufficient data for meta-analysis. Once those studies are identified, they are meta-analyzed. Dr. Smith said that he followed this process in EPII's 2003 manuscript and that he "did it again" for his 2007 book. The studies that contained sufficient data for meta-analysis in 2003 would still have been available in 2007. Therefore, one would expect the studies that are included in EPII's 2003 manuscript to also be included in Dr. Smith's 2007 book.

EPII did not present evidence that Dr. Smith published any information in his 2007 book that necessarily came from his use of its 2003 manuscript. The evidence showed that the CES studies contained in the 2007 book were not confidential information belonging to EPII. Instead, the studies were public information, and they were readily available from sources other than EPII's 2003 manuscript. The evidence showed that Dr. Smith had knowledge of available CES studies. Dr. Smith testified that, before his employment with EPII, he meta-analyzed fifty-two of the fifty-seven studies that are included in his 2007 book. The fact that Dr. Smith's 2007 book includes most of the CES studies that are included in EPII's 2003 manuscript is no evidence that Dr. Smith used EPII's 2003 manuscript when writing his 2007 book.

Dr. Kirsch testified that meta-analysis is a mathematical means of combining a number of studies to basically reaffirm the results. Because Dr. Smith's 2007 book includes most of the studies that are included in the 2003 manuscript, one would expect the results of his meta-analyses to be similar, if not the same, in both works. Thus, the fact that Dr. Smith's meta-analyses yielded similar conclusions in the 2007 book and the 2003 manuscript is no evidence that he used the 2003 manuscript in writing his 2007 book.

11

There is no evidence that Dr. Smith used EPII's 2003 manuscript in publishing his 2007 book or that he failed to return to EPII all copies of the 2003 manuscript. Therefore, no evidence supports the trial court's conclusions that Dr. Smith knowingly violated the 2003 permanent injunction "(i) [by] materially using EPII's 2003 Manuscript in the publication of Dr. Smith's 2007 Book, and (ii) by failing to return to EPII all copies and/or notes of his work on EPII's 2003 Manuscript." Dr. Smith's first issue is sustained.

In his second issue, Dr. Smith asserts that, in its final order and judgment of contempt, the trial court improperly expanded the scope of the permanent injunction in the 2003 judgment so as to preclude his use of nonconfidential information. The trial court made a distinction between "information" and "materials" in the 2003 judgment. In one injunctive provision, the trial court prohibited Dr. Smith from publishing or using information learned by him through his employment with EPII that was "not generally known in the industry." Under the terms of this provision, EPII's confidential information was protected from disclosure. On the other hand, Dr. Smith was free to publish or use information that was generally known in the industry. In another injunctive provision, the trial court prohibited Dr. Smith from publishing or using certain materials, including EPII's 2003 manuscript, which the trial court found belonged to EPII. In its final order and judgment of contempt, the trial court interpreted this "materials" provision to prohibit Dr. Smith not only from publishing or using the materials but also from publishing or using the information contained in the materials. Thus, the trial court found Dr. Smith "in contempt of this Court's August 11, 2003 permanent injunction prohibiting his publication of the information within EPII's 2003 Manuscript."

EPII does not contend that Dr. Smith published any of its confidential information in his 2007 book. However, as the trial court concluded, EPII argues that the injunctive provision prohibiting Dr. Smith from publishing or using "materials" precludes his publication or use of information within those materials, whether or not the information is confidential. EPII states that the permanent injunction "clearly prohibited [Dr.] Smith's publication or use of the information within EPII's 2003 Manuscript."

We disagree with EPII's argument for a number of reasons. First, EPII did not seek to protect nonconfidential information in the 2003 suit. Such a request would have been improper because an injunction that grants protection to information that is not confidential or proprietary is impermissibly overbroad. *Sw. Research Inst. v. Keraplast Techs., Ltd.*, 103 S.W.3d 478, 482

12

(Tex. App.—San Antonio 2003, no pet.).  Second, we look to the clear language in the 2003 judgment.  The trial court stated that "[Dr. Smith] may not . . . publish [or] use . . . any of the materials listed above."  The trial court did not state that Dr. Smith could not publish or use information that was in those materials.  Third, EPII's argument ignores the distinction between "information" and "materials" in the 2003 judgment.  If the "materials" provision is interpreted to include a prohibition against publishing or using nonconfidential information, it conflicts with the "information" provision in the judgment, which allows Dr. Smith to publish or use information that is generally known in the industry.  Fourth, EPII's interpretation of the "materials" provision is unreasonable because it results in the protection of nonconfidential information and, therefore, makes the provision impermissibly overbroad.  *Id.*

The trial court's 2003 judgment is unambiguous.  One reasonable interpretation of the judgment exists.  The judgment prohibited Dr. Smith from publishing or using information learned through his employment with EPII that was not generally known in the industry.  The judgment also prohibited Dr. Smith from publishing or using certain materials, including EPII's 2003 manuscript.  However, the judgment did not prohibit him from publishing or using the information contained in those materials, as long as that information was generally known in the industry.  There was no evidence that Dr. Smith published any of EPII's confidential information in his 2007 book.  Therefore, the trial court improperly concluded that Dr. Smith violated the 2003 judgment by "his publication of the information within EPII's 2003 Manuscript." Dr. Smith's second issue is sustained.

The trial court abused its discretion in finding Dr. Smith in contempt of the 2003 judgment.  Therefore, Dr. Smith is entitled to mandamus relief.  Based on our rulings on Dr. Smith's first two issues, we need not address his third and fourth issues.

We conditionally grant Dr. Smith's petition for writ of mandamus.  The trial court is directed to vacate its October 16, 2009 "Final Order and Judgment of Contempt."  With respect to the relief granted in this opinion, the writ of mandamus will issue only if the trial court fails to act by May 19, 2010.


April 29, 2010                                                        TERRY McCALL

Panel consists of:  Wright, C.J.,                            JUSTICE
McCall, J., and Strange, J.

13